**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN DOE II,** | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | **Civil Action No. _____** |
| | : | |
| **THE PENNSYLVANIA STATE** | : | |
| **UNIVERSITY; ERIC BARRON, in his** | : | |
| **individual capacity and his official capacity** | : | |
| **as President of the Pennsylvania State** | : | |
| **University; and DANNY SHAHA, in his** | : | |
| **individual capacity and official capacity** | : | |
| **as Senior Director of the Office of Student** | : | |
| **Conduct,** | : | |
| *Defendants* | : | |

## VERIFIED COMPLAINT

Plaintiff, John Doe II, a third-year Penn State Electrical Engineering student, files this civil rights lawsuit seeking to invalidate a two semester suspension based on a finding that he had received oral sex from a female student who later claimed that she was too intoxicated to have consented to the encounter. This finding was the product of a disciplinary process that deprived Plaintiff of the most basic due process protections, including the rights to a hearing and to be heard, to testify in person, to call witnesses on his own behalf, to cross examine his accuser and adverse witnesses, and to a fair and unbiased tribunal.

Although Penn State's Office of Student Conduct had long used an adjudicatory process that provided many of these fundamental protections, its Senior Director chose instead to adjudicate Plaintiff's charge by piloting its "Investigative Model," enacted several months after the alleged misconduct occurred. This new Title IX disciplinary regime, in which the Senior Director has unchecked discretion to use over the traditional due process

1

model, does not provide the accused with a hearing, does not permit the accused to call witnesses or cross examine his accuser or other adverse witnesses, and does not permit the fact-finder, known as the "Title IX Decision Panel," to meaningfully assess credibility by hearing the testimony of witnesses and observing their demeanor while testifying. Rather, a "Title IX Investigator" submits a written "Investigative Packet" to the Panel, which must then determine witness credibility, responsibility, and sanctions using nothing more than this Packet in conjunction with "instructive" material provided by the Office of Student Conduct.

Plaintiff filed this lawsuit because Penn State's Investigative Model denied him his right to due process and deprives him of his right to an education, his Penn State degree, sullies his reputation, and jeopardizes his future livelihood.

## PARTIES

1.    Plaintiff John Doe II is an adult male who, until October 23, 2015, was a student at the Penn State University. Plaintiff resides in State College, Pennsylvania.

2.    Defendant The Pennsylvania State University ("Penn State") is an educational institution established and operated by the Commonwealth of Pennsylvania with a principal place of business at 201 Old Main, University Park, Pennsylvania. Penn State operated under the color of state law at all times relevant to the complaint.

3.    Defendant Eric Barron is, and was, the President of Penn State at all relevant times. Defendant Barron's office is located at Penn State's University Park, Pennsylvania, campus. Defendant Barron is being sued in his individual and official capacity.

4.    Defendant Danny Shaha is, and was, Penn State's Senior Director of the Office of Student Conduct and Deputy Title IX Coordinator at all relevant times. Defendant

Shaha's office is located at Penn State's University Park, Pennsylvania, campus. Defendant Shaha is being sued in his individual and official capacity.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over Plaintiff's claims arising under the United States Constitution and 42 U.S.C. §§ 1983 and 1988 pursuant to 28 U.S.C. §§ 1331 and 1343.

6.     This Court has authority to issue the declaratory and injunctive relief sought in this matter pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Federal Rules of Civil Procedure 57 and 65.

7.     This Court has venue for this claim pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

**A.     Penn State adopts and pilots an "Investigative Model" to adjudicate student sexual misconduct claims.**

8.     Less than two months after taking office, Penn State University President Eric Barron announced the formation of a Task Force on Sexual Assault and Sexual Harassment and charged it with making recommendations that would allow the University to "become the benchmark by which other universities are judged when it comes to sexual misconduct prevention and response." Exhibit 1, Task Force on Sexual Assault and Sexual Harassment Report, January 23, 2015, p. 1;

http://www.psu.edu/ur/2014/Task_Force_final_report.pdf, hereafter the "Report."

9.     In its January 23, 2015, final report, the Task Force acknowledged that the context for its recommendations included

a growing national debate about higher education's response to the problem of sexual and relationship violence. The White House and Congressional leaders, spurred by student activists on college and university campuses, convened various groups to discuss the issue. Multiple federal guidelines were published. National higher education organizations sponsored related conversations across the country. The nation's news media increasingly focused their attention to the conflicts inherent in the problem. And the Department of Education continued to add new schools to its list of those colleges and universities under investigation for Title IX concerns—a sum that numbered eighty-six by early November, many of them among the most notable higher education institutions in the country, including Penn State.

10.    Less than a month later, President Barron adopted each of the Task Force's 18 recommendations, including its recommendation that "the student conduct process at each campus move away from the traditional hearing process and embrace instead an investigative model for resolving sexual misconduct cases."

11.    This "Investigative Model" "would rely upon a professional investigator, rather than a hearing board, to conduct the required fact finding in [sexual misconduct] cases."

12.    According to the Task Force, the Investigative Model would strike a balance between obtaining fair, accurate outcomes while avoiding the "undue stress and other harm too often caused by the current hearing model."

13.    At the request of Defendant Barron, Defendant Shaha revised Penn State's student discipline procedures to comply with the Report's recommendations. An April 29, 2015 *Penn State News* article announced that the Office of Student Conduct had begun "piloting" the model and expected to permanently implement it in the Fall of 2015. The revised procedures are set forth in a document accompanying this Complaint as Exhibit 2, Code of Conduct & Student Conduct Procedures,

4

http://studentaffairs.psu.edu/conduct/Procedures.shtml, hereafter "the   Procedures."

14.     Prior to the inception of the Investigative Model, disciplinary proceedings addressing claims of sexual misconduct required a hearing where witnesses testified in-person  before a fact-finder and were subject to cross-examination.

15.     The Investigative Model dispensed with these requirements.

16.     Under the Investigative Model, no live witnesses with firsthand knowledge appear  before the fact-finder.

17.     Rather, an investigator meets with the complainant and the respondent, both of whom "may provide written statements, witness names, and other information related to the  allegation."

18.     The investigator then "meet[s] and obtain[s] information from possible witnesses."

19.     Following this "initial investigative stage," the investigator produces "an Investigative Packet" available for review by both the complainant and respondent.

20.     Either party may, after review of the Packet, respond to its contents.

21.     After this review and response, the investigator "address[es] and correct[s], if appropriate, any factual inaccuracies, misunderstanding, etc., and may also conduct additional  investigation as appropriate."

22.     If the Investigator determines that the information in the Investigative Packet "does not reasonably support a Code of Conduct violation, the case is closed without  charges."

23.     If, on the other hand, the Investigator determines that "the acquired information  reasonably supports a Code of Conduct violation," charges are assigned and

both the complainant and the respondent are "given an opportunity to provide a response to the charges."

24.     This "response to the charges" is provided to the investigator for inclusion in the Investigative Packet.

25.     Upon receipt of these responses, the Investigative Packet is forwarded to the Title IX Decision Panel," defined as:

> a specific group of faculty and staff authorized by the Senior Director to review cases alleging Title IX violations that have been assigned to it, to determine whether a student has violated the Student Code of Conduct, and to assign sanctions in response to violation(s).

26.     The "Senior Director" is the "Senior Director of the Office of Student Conduct who is designated by the University President to be responsible for the administration of the Code of Conduct and the student conduct process."

27.     On the basis of its consideration of the Investigative Packet, the Title IX Panel "review[s] the case and make[s] a decision of responsibility/non-responsibility based on the preponderance of evidence standard." When "responsibility" is assigned, the Panel also determines which sanctions to impose.

28.     No witnesses appear personally before the Title IX Panel.

29.     The respondent is at no stage afforded the opportunity to question adverse witnesses.

30.     The Title IX Panel decides the facts of the cases before it based solely on the written submissions in the Investigative Packet.

31.     It is believed and therefore averred that the Title IX Panel is provided with certain materials by the Office of Student Conduct to inform its deliberations. These include the following documents:

      a.      "Considerations in a Sexual Misconduct Hearing"

      b.      "Decision Model for Sexual Misconduct 2005"

      c.      "Incapacitation Document for Hearings 2012"

      d.      "Preponderance Statement for Hearings 2014"

      e.      "The Response Continuum:  From Written Consent to Self-

Defense"  A copy of each of the above documents accompanies this Complaint as

"Exhibits 3-7.",  respectively.

32.      The document provided to the Panel entitled "Considerations in a Sexual

Misconduct Hearing" contained a "Considerations on Behalf of the Alleged Victim"

section  instructing the Panel that only 2% of sexual assault accusations are false.

**B.      The Investigative Model is used to suspend Plaintiff from Penn State for  receiving oral sex from a female student.**

33.      Plaintiff John Doe II is presently 20 years of age.

34.      Plaintiff enrolled in the Pennsylvania State University ("Penn State") Fall

semester of the 2013-2014 academic year.

35.      Plaintiff is studying electrical engineering, and  had he completed the present

semester he would have had three additional semesters of study to  complete his degree.

Plaintiff had a cumulative Grade Point Average of 3.37, achieving Deans List 3 of his 4

completed semesters.

36.      The electrical engineering program contains a highly specialized  curriculum,

and Penn State's program is renowned for placing graduates into competitive positions.

37.      Plaintiff has paid to Penn State tuition in excess of $87,000.00 since

beginning  his studies there.

38.     On December 4-5, 2014, Penn State student Jane Doe[1] ("Complainant") attended a party with her sister and friend at Plaintiff's State College Fraternity House.

39.     In the early morning hours of December 5, Complainant, Plaintiff and three other fraternity brothers were in the basement listening to music when Complainant suggested having a "fivesome." Complainant announced "no pictures or video" and performed oral sex on three of the Fraternity brothers, including Plaintiff.

40.     Plaintiff did not believe that Complainant was unable or unwilling to consent to performing oral sex on him.

41.     Plaintiff did not believe that Complainant was "incapacitated" at any time during the encounter or during the short period of time prior to it when he observed her briefly in the Fraternity's kitchen.

42.     On information and belief, later that morning the Complainant's sister heard Fraternity brothers talking about a "fivesome."

43.     Complainant confirmed to her sister that she had been involved in the incident.

44.     The Fraternity held a "formal" on December 12, 2014.

45.     Complainant attempted to gain entry to the Fraternity during the formal.

46.     Complainant was denied entry to the Fraternity formal because she was not escorted by a "date" who was a member of the Fraternity.

47.     On information and belief, Complainant was angered at being excluded from the formal.

48.     On information and belief, Complainant believed that she had been excluded from the formal because she had initiated a "fivesome" on the preceding weekend.

---

[1] Complainant's name is known to the parties and identified in the Plaintiff's pseudonym motion.

49.     On information and belief, Complainant's sister reported the "fivesome" incident  to the State College Police Department on December 26, 2014.

50.     Following an investigation, the State College Police Department declined to file  criminal charges against any participants in the "fivesome."

51.     Complainant met with  Spencer Peters, a former University police officer who serves as the "Title IX investigator" for  Penn State's Office of Student Conduct under the supervision of the Senior Director.

52.     On May 1, 2015, the Office of Student Conduct issued an "Administrative Directive" to Plaintiff and others ordering them to have "no contact" with the Complainant. A copy of the Administrative Directive accompanies this Complaint as "Exhibit 8."

53.     Throughout the spring and fall of 2015, Complainant continued to attempt to visit  the Fraternity house.

54.     Also on May 1, 2015, Karen Feldbaum, Associate Director of the Office of Student Conduct, sent Plaintiff a "Notice of Investigation"  informing him that that "the Office of Student Conduct [was] investigating an allegation that he  was involved in behaviors that violated the Student Code of Conduct." A copy of this Notice of  Investigation accompanies this Complaint as "Exhibit 9."

55.     Plaintiff proceeded from  this initial notice of investigation, throughout the entire disciplinary process without the aid of counsel. It was not until after the suspension was imposed that Plaintiff consulted with counsel.

56.     The document identified, without elaboration or factual detail, that the Office of  Student Conduct investigation involved "sexual harassment and misconduct."

57.     The Notice informed Plaintiff that he would be contacted by Office of

Student  Conduct staff member Spencer Peters for the purpose of "discuss[ing] the allegation" and  providing Plaintiff with "the opportunity to share [his] perspective."

58.     While the Notice explained to Plaintiff that he was not "obligated to share information" with Peters, it warned that he was "required to participate [and that] [f]ailure to do so could result in a  separate  Student  Code  of Conduct  violation,  specifically ... Failure to  Comply."

59.     The Notice further informed Plaintiff of the following:

a.     that he was being subjected to disciplinary process under the "Investigative Model" as defined by the Section V, Subsection D, of the Student Conduct  Procedures;

b.     that he would be entitled to an advisor of his choosing to "accompany"  him throughout the process;

c.     that he was not permitted to record any meetings during the process, nor could he photograph or remove any documents that he was permitted to review "related  to the investigation";

d.     that he would be "permitted to review and comment on the investigative  packet prior to it being finalized";

e.     that Peters was a "neutral fact finder" to whom Plaintiff would "be able to  provide all evidence, documentation, witnesses, etc., to assist in the investigative process";

f.     that he was "strongly encouraged" to supply such materials to Peters;

g.     that he would be permitted to ask Peters "questions related to the investigative process";

h.      that he "should expect to be asked questions" and that his "honesty [was] expected";

i.      that the information obtained during the process was confidential "by federal" law and would only be used in accordance with such.

60.    Peters conducted an investigation that culminated in the preparation of a report, in draft form, summarizing the information he reported receiving from the complainant, witnesses, and three other accused students.

61.    Peters permitted Plaintiff to review and comment on this report, but would not permit Plaintiff to have a copy of it. Plaintiff was in New Jersey participating in a full-time internship, and was denied a reasonable accommodation to view the report after edits were made as is customary.

62.    Plaintiff submitted to Peters a written narrative statement on June 30, 2015 of the events of December 4-5, 2014, in response to the sexual misconduct allegation. A copy of this statement with its supporting exhibits accompanies this Complaint as "Exhibit 10."

63.    Plaintiff's statement emphasized that Complainant did not appear to be impaired when she performed oral sex on him:

> During the time of the incident, I did not witness [Complainant] drinking any alcohol or other alcoholic beverage. She appeared normal and spoke in complete[ly] sentences. As a matter of fact, she methodically gave specific 'instructions' that she did not want any photographing, or video recording. An incapacitated person would not be able to give such clear and detailed instructions.

Exhibit 10.

64.    It is believed and therefore averred that Peters recounted Complainant as claiming that she did not consent to performing oral sex because:

a.       she was "too drunk" to consent;

b.       she did not recall many details and therefore could not have consented;

c.       she "felt really far gone";

d.       she "probably" was unable to stand at times during the incident;

e.       she did not recall leaving the Fraternity but recalled waking up the next morning; and

f.       she was in the basement without clothes on.

65.       It is believed and therefore averred that Peters' report included the following information pertaining to Complainant's condition on the night of the incident:

a.       She stated that, just prior to the incident, she ate a cheese steak, was "hanging out" with other people, and was functioning "pretty fine";

b.       She never became sick and did not vomit;

c.       She stated to the State College police during the criminal investigation that "the males would not have known that she did not consent."

d.       The friend who was with her that night, stated that she appeared fine, was aware of the location, walked without assistance, and communicated appropriately on a walk to another fraternity immediately prior to the incident.

e.       This same friend stated that, she walked without assistance, was able to use her phone, and appeared to be functioning fine on the return walk to the Plaintiff's fraternity.

f.       The friend recounted that, just prior to the incident at the Fraternity, she told her that she did not want to leave.

g.       The friend further related that she left the Fraternity without her

because  she was not concerned about her because she was aware and functioning fine.

  h. This friend noted that she would not have left her alone had she felt  otherwise.

66. Peters presented the foregoing in written form to the Title IX Decision Panel,  along with other material.

67. The Panel reviewed Peters' report and issued its decision on September 4, 2015,  finding that Plaintiff was "responsible" for committing two Code of Conduct violations:  nonconsensual oral sex and sexual misconduct involving an incapacitated person. A copy of the  Panel's decision accompanies this Complaint as "Exhibit 11."

68. The Panel concluded that the Complainant was "incapacitated at the time of the  incident and therefore unable to consent" because she "indicat[ed] that" she:

  a. "experienced some black-out moments";

  b. "fell on the floor and was then helped by somebody [Complainant did] not  remember"; and

  c. "exhibited outrageous and unusual behavior."

69. The Panel further concluded that her account was "in good agreement with" "the  rest of the testimonies in the investigative packet."

70. Although Plaintiff never appeared before the Panel, the Panel nonetheless concluded that he "seemed insensitive to the nonconsensual nature of the sexual acts" and  recommended that he be suspended from Penn State for two semesters.

71. Interestingly, this is the same exact language the Panel used in its findings with respect to other students accused with Plaintiff.

72. This fact exemplifies the inadequate review process, and total failure to afford

Plaintiff's case individual attention.

73.     On October 1, 2015, Plaintiff appealed the Panel's decision in accordance with Penn State's procedures. A copy of Plaintiff's appeal accompanies this Complaint as "Exhibit 12."[2]

74.     By letter dated October 20, 2015, the appeals officer denied Plaintiff's appeal. A copy of this letter accompanies this Complaint as "Exhibit 13."

75.     On October 20, 2015, the Office of Student Conduct notified Plaintiff by cover email that his suspension went into effect immediately and he was no longer permitted to be on the campus. A copy of this notification accompanies this Complaint as "Exhibit 14."

76.     Penn State's disciplinary sanction will cause Plaintiff's life to be placed on "hold" for a year. Plaintiff will not likely be able to find employment, join the armed services, or transfer to another university while under suspension if he is honest on the applications.

## CAUSE OF ACTION -- VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSITUTION PURUSANT TO 42 U.S.C. § 1983

77.     The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law."

78.     Plaintiff had a property interest protected by the Fourteenth Amendment in continuing and finishing his education at Penn State University.

79.     Plaintiff has a liberty interest protected by the Fourteenth Amendment in his good name, reputation, honor and integrity.

---

[2] In an attempt to contradict the Panel's finding that Complainant's 'outrageous and unusual behavior' indicated she must have been incapacitated, Plaintiff attached two photographs to his appeal packet. These photos depicted the Complainant "skinny dipping" while holding a beer can. These two photographs have been removed from Exhibit 12 but are available upon request of the Court or Defendant's counsel.

80.    The Title IX Decision Panel was required to determine whether Plaintiff's account  of the "fivesome" incident was true, or whether Jane Doe's account was true.

81.    The accuracy of this credibility assessment by the Title IX Panel was essential to  minimize the risk of erroneous deprivation of Plaintiff's constitutional interests.

82.    A fact-finder's ability to observe the demeanor of a witness while testifying is  indispensable to an accurate assessment of the witness's credibility.

83.    Cross-examination of a witness who testifies is essential to ensure that a fact-finder accurately assesses the witness's credibility.

84.    The Defendants violated Plaintiff's right to due process by refusing to permit  Plaintiff to personally appear and testify before the Title IX Decision Panel.

85.    Defendants violated Plaintiff's right to due process by  not requiring that the witnesses against Plaintiff appear personally to testify before the Panel.

86.    Defendants violated Plaintiff's right to due process by refusing to permit Plaintiff  to present the in-person testimony of witnesses appearing on his behalf to the Panel.

87.    Defendants violated Plaintiff's right to due process by refusing to permit Plaintiff  to cross-examine the witnesses offered against him.

88.    Defendants never notified Plaintiff prior to the submission of his case to the  Panel, that it provided "instructive" documents to guide their decision-making process.

89.    Defendants violated Plaintiff's due process rights to notice and an opportunity to  be heard on the statements contained in these documents.

90.    Defendants violated Plaintiff's due process right to an impartial tribunal by providing the Panel with materials causing the panel to be necessarily biased against respondents  in sexual misconduct cases.

91.     By providing the Panel with *de facto* expert witness testimony in advance of the submission of Plaintiff's case to the Panel, the Defendants violated Plaintiff's due process right to contest the testimony of adverse witnesses.

92.     By not requiring that the authors of these materials appear and testify, the Defendants violated Plaintiff's due process right to cross-examine adverse witnesses.

93.     Penn State's Office of Student Conduct is charged with enforcing the Code of Student Conduct. In this respect, OSC serves a prosecutorial function.

94.     Defendant Barron authorized and then adopted the Task Force's recommendation thereby implementing the Investigative Model. Defendant Barron also delegated unfettered authority to Defendant Shaha to decide which prosecutorial model to use in a Title IX sexual misconduct investigation.

95.     Defendant Shaha is responsible for authorizing faculty and staff to serve on the Title IX Decision Panel.

96.     When the Title IX Decision Panel reviewed Plaintiff's case, its members would have known that the Senior Director authorized the initiation of the disciplinary process and that the investigator had determined that the allegations "supported" violations of the Code of Student Conduct.

97.     The vesting of both prosecutorial and judicial functions in the Office of Student Conduct deprived Plaintiff of his due process right to a fair and impartial tribunal.

98.     The Defendants violated due process by failing to provide Plaintiff with a disciplinary process commensurate with the seriousness of the charges and the magnitude of the constitutionally protected interests at stake.

99.     As a direct and proximate result of the aforementioned due process

deprivations,  the Plaintiff has been wrongly disciplined and is suffering ongoing harm to his

right to an  education and other protected constitutional interest.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff prays that the Court award the following relief:

(i)      a declaration that Penn State's "Investigative Model" for adjudicating Title

IX  sexual misconduct cases violates the Due Process Clause of the Fourteenth Amendment

to the  United States Constitution;

(ii)     an injunction requiring that the Senior Director of the Office of Student

Conduct  reverse Title IX Decision Panel's finding that Plaintiff was "responsible" for violating

the code of conduct  by  engaging  in  nonconsensual  oral  sex  and  sexual  misconduct

involving  an  incapacitated person;

(iii)    an injunction requiring that President Eric Barron reinstate Plaintiff as a student

in  good standing at Penn State;

(iv)     an injunction  requiring that the  Senior  Director  of the  Office  of  Student

Conduct  cause to  be expunged Plaintiff's disciplinary  record  and  remove any record of

disciplinary  contact from Penn State's records;

(v)     an injunction requiring that the Senior Director of the Office of Student

Conduct  cause to be destroyed any record of the disciplinary complaint made against Plaintiff;

(vi)     an injunction requiring that the Office of Student Conduct contact Plaintiff's

course professors and instruct them to allow Plaintiff adequate time to make up work missed

during the erroneous suspension period; and

(vii)   a judgment declaring that the defendant violated Plaintiff's rights to due process

of law;

(viii)    monetary damages;

(ix)      attorney's fees and costs of suit;  and

(x)       such as relief as deemed necessary and just by this Court.


                                        Respectfully Submitted,


November 3, 2015                        s/ Mark S. Weaver
                                        PA ID #63044
                                        2790 W. College Ave, Suite 800
                                        State College, PA  16801
                                        16801  (814) 237-6255
                                        (814) 237-5752 fax
                                        weaver@mazzalaw.com
                                        *Attorney for Plaintiff, John Doe II*